20-5100 Food and Water Watch, a non-profit corporation, appellant, v. United States Department of Agriculture, an agency of the United States government, et al. Ms. Hineson for the appellant, Mr. Buchbacher for the appellate. Ms. Hineson, good morning. Good morning. May it please the court, Tara Hineson for Appellant Food and Water Watch. The U.S. Department of Agriculture's Farm Service Agency guarantees farm loans of last resort, loans to farms that could not obtain financing without the government's backing. In this case, the agency is guaranteed a more than $1.2 million loan for a large contract chicken operation that raises more than 1 million birds each year for vertically integrated meat company Allen Harem in Caroline County, Maryland. This location was selected specifically because it's already home to numerous other Allen Though it's adjacent to high-quality Watts Creek, and both the local Chop Tank River and the downstream Chesapeake Bay are significantly polluted by agricultural runoff. The loan guarantees NEPA environmental assessment, short-changed analysis of the facility's environmental impacts in several ways. But first, I'd like to briefly address standing. Chief Judge Howell got it right when she found that Food and Water Watch's injury here is redressable because there's no real doubt what the third-party lender and borrower would do in response to the court granting the relief requested, which is to vacate the environmental assessment and the loan guarantee. In this circuit, a plaintiff need not show to a certainty that a favorable decision will redress its injury. A significant increase in likelihood of relief is enough. Appellant meets this standard because this is not a case where truly independent third parties are making unfettered choices, as in Lujan, leaving the court to speculate that they would agree to conditions included in a new loan guarantee following additional NEPA analysis ordered by the court. Ms. Hyneson, how do we know that a loan guarantee would even be sought again? So now this loan's been in place now for several years, you know, the farm is an ongoing concern. How do we even know that, you know, is there any evidence in the record that the bank, that the lender would seek an additional, like another loan guarantee in the current circumstances? Absolutely, Your Honor. First, standing is of course judged at the time of the complaint, not under current circumstances. And here, the agency, the lender, and the borrower are all bound up together through the loan guarantee and the loan itself. If the guarantee is vacated, the lender has a strong financial interest in restoring the protection of a federal guarantee for the remaining majority of the loan's duration. At the time of the complaint, they were just two years into a 15-year loan guarantee with more than a million dollars still owed. So from the lender's perspective, the interest in a guarantee for a million-dollar loan is essentially the same as for a 1.2-million-dollar loan. And there is a strong indication that their same incentives will apply. But you say a strong indication, but is there any evidence that the calculation for the bank is the same two years into the loan as at the outset when there's no farm and no ongoing business? Well, Your Honor, the lender's perspective is not represented in the record directly, but the borrower's incentives at the time of the complaint were even stronger than at the time of the loan. Again, we're just two years into a loan of last resort, and this borrower had put a lot on the line for this financing, including others' property as collateral. So she has the incentive to maintain her home, her collateral, and her business, and there's no serious doubt as a result that both the operator and the lender would comply with the conditions on the new guarantee to protect these financial relationships. The lender's interest here is very much like in Bennett v. Donovan, where the court looked to the lender's financial interests in allowing the agency, which in that case was HUD, to take over a reverse mortgage. In that case, the court found it was reasonable to see that there was a path to redressability because the agency could choose to offer to the bank to take over the loan and that the lender would likely agree to do that. Here, the lender's financial incentives are even stronger. Was this case decided on summary judgment? This case before us today, yes, Your Honor. You say standing has to be assessed at the time of the complaint. That's true, but this is the point. The question, the evidence that can be considered at the complaint stage is your allegations, but when you get to the summary judgment, Lujan holds that you have to prove the allegations that establish your standing. That doesn't answer the question that Judge Rao raised, which is where is the evidence at summary judgment that any of these scenarios that you're putting forth would possibly or probably come true? Well, Your Honor, we did not seek discovery in this case. After early in the case, Chief Judge Howell found that we had demonstrated redressability based on the information in the record. On the basis of the allegations in the complaint, but what about its summary judgment? Well, Your Honor, in this case, we didn't think that discovery was necessary because the information in the record at the time of the complaint demonstrates the financial incentives are very strong, and the standard for redressability here is that it is likely that the third parties would take this action. We don't have to demonstrate that to a certainty, and this court has repeatedly looked to third parties' past actions and their financial incentives in looking to whether they would be likely to act in response to a government action, and in this case, under the circuit's case law, that should be enough. Here there are clear financial incentives in play. The agency has essentially tried to make this about the situation today. It has speculated that the borrower's finances may have changed dramatically during the pendency of the litigation, but the agency is here trying to reprise its failed mootness argument, and it has not provided any evidence to meet its burden that the case is moot and that the court cannot grant any effectual relief whatever. Ms. Heinzen, I will ask the department this as well, but I guess I have a concern that this case might be moot under the recently enacted NEPA regulations, right? I mean, those provide that loan guarantees and specifically mention FSA loan guarantees as not being major actions within NEPA, so even if we were to grant the relief that you seek, vacate the loan guarantee and the environmental assessment, why would USDA have to even do another environmental assessment, even assuming that the lender sought a loan guarantee? Yes, Your Honor. Well, as the agency points out in footnote one of their brief on pages six and seven, the Farm Service Agency has stated that it intends to proceed under its status quo of its own agency NEPA regulations. I'm aware of that, but the NEPA regulation itself says, let me see, hold on. It says that the regulations in the subchapter apply to any NEPA process begun after September 14th, 2020. Yes, Your Honor. Right? So a NEPA process, you know, so if they were to issue a new loan guarantee and start a new NEPA process, that would not be an ongoing activity, I think, under the meaning of the new revised NEPA regulations, or I guess what's your account of why it would be? Well, Your Honor, the agency's own specific NEPA regulations are still in effect, and they still do require an environmental assessment for a facility of this size. And so as long as those regulations are still in effect, and of course, the Council on Environmental Quality regulations are currently in litigation. Actually, you have a better answer. And the answer is that the CEQ, which is a part of the Executive Office of the President, has no rulemaking authority. And so those rules, or whatever they are, they're interesting, but they're not binding on any particular agency. And we recognized that problem with CEQ a long time ago in a footnote in an opinion dealing with the building of the bridge south of Washington, where an environmental impact statement was required. So I don't know that you can, I don't know that you can even, you even have to distinguish the new NEPA CEQ regulation. Thank you, Your Honor. If there are no additional questions on standing, I'd like to turn to the merits. The agency here failed to take a hard look at the facility's cumulative impacts. Here, the circuit case law requires environmental assessments such as this one to have a cumulative impacts analysis that considers past, present, and reasonably foreseeable future actions to determine the overall impact that can be expected if individual impacts are allowed to accumulate. By definition, cumulative impacts can result from individually minor actions. Here, the Farm Service Agency did not conduct any meaningful cumulative impacts review, overlooking the existing concentration and expected future expansion of the area's chicken industry, and providing no actual analysis of the facility's incremental impact against this background. Regarding past and present actions, the assessment makes clear that this entire project is premised on fostering chicken industry consolidation, and the agency is trying to have it both ways by expressly relying on Alan Harim's existing concentration to define this project's purpose and need, and to reject alternatives such as other locations, while ignoring the cumulative impacts of doing so. The assessment does acknowledge that the Upper Trop Tank River and the Chesapeake Bay are impaired by pollution, and subject to a Clean Water Act cleanup plan known as a total maximum daily load. But this is not enough to salvage the conclusory cumulative impacts analysis here for two main reasons. First, assuming that this cleanup plan will account for cumulative impacts, overlooks impacts to high-quality Watts Creek. The total maximum daily load is meant to attain certain water quality standards in the Trop Tank River and the Chesapeake Bay, but it is not intended to ensure that Watts Creek maintains its high water quality. Watts Creek is immediately adjacent to the facility, and is a waterway one of Food and Water Watch's declarants relies on for fishing every year. Second, even if the Bay cleanup plan were an acceptable baseline to look at this project's impacts, establishing the baseline is only the first step. This court recently confirmed that the cumulative impacts review requires substantive analysis of how the present impacts of past actions would combine and interact with the added impacts of the decision. But here, the only place that the assessment discusses the project's pollution in the context of baseline conditions, is in stating that surface water quality measures will be implemented in accordance with various permits and the requirements of the total maximum daily load. This simply provides no analysis of impacts at all, and this court has repeatedly rejected such simple, conclusory statements of no impact. This lack of analysis is largely due to the agency's impermissibly substituting other agency's standards and permits for any independent analysis of the farm's cumulative impacts. The agency here simply assumes that Maryland agency's permits and the total maximum daily load will ensure no significant impact. But this court has established that assuming other agency's permits will ensure no cumulative impact with no independent hard look is arbitrary and capricious because relying wholly on other agency's standards would render NEPA's procedures superfluous. The court further recently held that the existence of permit requirements overseen by another federal agency or state permitting authority cannot substitute for a proper NEPA analysis. Can I just, can you just, let me just ask the courtroom deputy, have we lost Judge Randolph's just by video, or also, is he here with us? Judge Randolph is with us, he just turned his video off. Okay, that's fine. I just didn't want him to miss the argument. Thank you, Your Honor. This independent analysis by the Farm Service Agency is critical here because the record shows that such shipping confinements do contribute pollution and that the permits at issue here are not meant to result in zero pollution. In other words, total maximum daily load or not, this agency decision allows a new source of pollution into several waterways. The agency further erred in failing to consider foreseeable future actions. The agency itself here plays a role in determining where these chicken operations will locate through its loan guarantees, but it claims that all future impacts are simply too inchoate to evaluate. The record contradicts this claim. The Farm Service Agency loan officer for this project stated in an email to concerned citizens that there is a land war going on with people buying property to build chicken houses. This court held in Delaware Riverkeeper Network v. FERC that an agency need not foresee the unforeseeable, but reasonable forecasting and speculation is implicit in EPA, and the court should require that here. Similarly, the agency's reliance on draft and generic mitigation plans was arbitrary and capricious. For an agency to rely on mitigation measures, its reliance must be reasonable, and that means that there must be some evidence and some analysis establishing that the measures will be effective in preventing significant impacts. Here, the agency's own regulations further require that mitigation be practical, enforceable, and tailored to fit the specific needs of the action. Nonetheless, the agency here relied on draft mitigation measures that were not well enough developed to determine they would be effective, and again, failed to ensure that they would be tailored to the project or independently analyze their effectiveness. The most stark example is the nutrient management plan. The assessment says surface water impacts will be managed by best management practices that will be outlined in a nutrient management plan and conservation plan. This nutrient management plan, in turn, can include such open-ended practices as identifying site-specific conservation practices. So, in effect, this is nothing more than a plan to make a plan. The court recently rejected just such incomplete mitigation in American Rivers Beefer and should do so again here. Ms. Hineson, I see you are out of time. Judge Randolph, do you have any further questions?  Okay. Thank you. Thank you. Now hear from the government. Thank you, Your Honor. May it please the court, my name is Michael Bushbacher from the Justice Department representing defendants at police. I'd like to begin with standing before turning to the merits. Plaintiff hasn't shown how a victory here could lead to redress of any of its alleged injuries. Now, I want to focus on one important point that plaintiff didn't talk about, which is the farmer. We agree that before she obtained the loan, the farmer had an incentive to support the lender's application for a loan guarantee. Without that guarantee, she probably would not have gotten the loan and then might not have been able to start the farm. But that incentive evaporated once she received the loan more than five years ago. Under Lujan, the burden is now on plaintiff to present affirmative evidence showing why the farmer and the lender, after having executed that loan agreement, would nevertheless be likely to agree to new and, for the farmer, potentially costly mitigation measures. Vagator of the guarantee itself doesn't get plaintiff what it wants. Vagator would change the risk allocation between the government and the lender, but it wouldn't affect the validity of the loan unless one of two things were the case. The first is that there's some kind of contract provision that the farmer agreed to that would put something like that in effect, and the other is if the agency itself had the legal authority to impose new conditions on the loan. Plaintiff hasn't made any contract arguments here, so option one's not at issue. As for option two, plaintiff is just incorrect in its brief where it talks about the regulations that Farm Service Agency had in place at the time, 7 CFR section 1940.318G and M. Neither of those subsections authorizes the agency to impose new requirements on a loan agreement. Subsection G, that applies only to ongoing applications. As Judge Rao pointed out, why would the parties here, or not the parties, the non-parties, the farmer and the lender, agree to start that process again? Especially for the farmer, she has no incentive to do so since there's only a downside that's in the offering for her because there's a likelihood that she would have to comply with new and potentially costly mitigation measures, but she wouldn't get anything in return. She already has the loan. So there's no evidence that they've pointed to that would show that there is some reason why the parties would, to that agreement, would again seek a new loan guarantee. As for subsection M, I think that's where plaintiff put the most emphasis in its brief, but that also doesn't allow for changing executed contracts, certainly not contracts like the loan agreement, which are between the lender and the farmer and which the agency is not a party to. That provision just says that the approving official should consider comments and other information that's received after an approval has been issued. Did the Farm Service Agency or Agriculture adopt the new amendment by CEQ to their regulations? So the new CEQ regulations do purport to be binding on all federal agencies, including Farm Service Agency, is currently actually a case before the District Court of D.C. about the scope of how that interacts with the agency's own regulations. The United States' position there is that the Farm Service Agency's current regulations continue to govern. To Judge Rao's point earlier about... What is the basis for the... You recognize that CEQ traces its authority, even in the most recent iteration of the regulations, to no federal statute. It's an executive order that Jimmy Carter, President Carter, issued setting them up. Yes, I do recognize that. Like I said, there is a dispute about whether the new NEPA regulations require FSA immediately to implement those restrictions about loan guarantees or whether the agency can bind itself by issuing new regs, and at that point the change happens. I don't know if that makes sense, but the dispute is about... That case is about rightness and whether the CEQ regulations are sufficient to make a right dispute. My more... Is it the government's position that the CEQ regulations are binding on other agencies or not binding? Yes, they are binding. That is the government's position. That is the government's position. The question here is... That's a new position, a relatively new position. I can tell you from personal experience back in the ancient past that the government's position was that they were not binding. Ultimately, I think that that point is not relevant here. This is not a procedural injury standing argument in the sense that there are third parties whose independent conduct is really where the focus is. We've... For the purpose of standing, when it comes to getting what they want from the agency, we're not contesting that they could get a different result. That's been our position in this lawsuit, and certainly that was the case at the time. Is relevant for us, I mean, in terms of mootness, though, because if the CEQ regulations are binding, then I think there's a live question of mootness. I mean, they may not be binding for the reasons that Judge Randolph gives, but if they were binding, then would this case be moot? I think so, Your Honor. I think that it would be mooted if it's binding and the agency doesn't have discretion to wait to implement it pending its further regulations. So I think that second point's crucial. And what's your argument on the second point? On the second point of what, I'm sorry? About whether the agency has... whether the agency must follow the new regulations now before promulgating its own regulations. We certainly believe that the agency has an obligation to follow NEPA and the new regulations. Our position is that the... I'm sorry, it's been a while since I've looked at the briefing in that other case. Our position is that the... that those farm service agency regs that they are working on and will promulgate, that it's not in conflict with the new NEPA for them to do that. I have to interject. I recognize, in talking about the validity of the CEQ regulation or the binding effect, that there's some language in a Supreme Court case or our cases saying that they're binding or they're mandatory or whatever. But I kind of view that in the same way as if the court takes jurisdiction without considering the underlying problems with asserting jurisdiction. So I don't know that those cases are necessarily conclusive in race judicata or whatever collateral estoppel cases. Your Honor, I would just say that because you can consider questions of mootness and standing in any order that you want, we would ask you to look at our standing argument first before considering any mootness argument sua sponte. And on the standing point, they just don't have the evidence. It is, as Judge Randolph pointed out, their burden to come forward with something showing why they could get redress and they haven't done that. And we certainly agree that the relevant point in time for that is when they filed suit. And our brief says exactly that and they've only selectively quoted it in their brief to suggest otherwise. We've said all along that from the time they filed suit through today, they don't have what it takes to demonstrate standing. And before turning to the merits, I just want to respond quickly to that idea that the parties, the FSA and the farmer and the lender are all bound together. Well, they're bound together in one sense, but not in the sense that they all went through the loan guarantee process the first time and that there's an executed loan guarantee and there's an executed loan agreement. But they're not bound in some sort of future sense. They're not required to go forward and engage again in some renewed process here. That process is entirely voluntary. This is not, as the district court I think thought, a case where there's some sort of regulation in place. This is simply a voluntary thing. Anything that happens in those discussions that leads to an agreement that what's binding on the parties is a result of a contract, not a regulation. So turning to the merits, I think there's a lot that's going on in the brief, but there's really I think only one thing that you need to know. I just want to go back to a little bit about the redressability question. Yes, Your Honor. Suppose the district court issued an order staying the effect, holding that the loan guarantee was void but staying the effect of that until the parties or until an environmental assessment was redone. Would the case be would there be a standing problem then? The standing problem here doesn't stem from anything that would happen before the agency. The standing problem here in terms of reconsidering the EA the standing problem here is that there is nothing to suggest certainly nothing plaintiff has pointed to that the farmer would have any incentive to agree to bind itself to potentially costly new mitigation measures when it gets nothing in return. That assumes that there's going to be more costly mitigation methods. I'm assuming that because on a procedural injury case the way to look at what the agency does is to just assume that the plaintiff gets kind of the best case result. The best case result in an environmental impact or even assessment case is informational that the Farm Service Agency will get more information before it again makes its decision. I think plaintiffs not looking for information they haven't alleged an informational injury here. Their point is that we either shut down the farm by bringing the suit or we at least get some kind of mitigation measure. That's the redress that they're seeking. They're not seeking additional information. Even if the assessment turned out to show that there's going to be massive pollution in the Chesapeake Bay as a result of this farm the Farm Service Agency can still go forward. It certainly can still go forward, Your Honor. The regulations that were in place at the time did encourage the agency to consider mitigation measures and so that's why instead of putting our argument into fighting how exactly the agency might be able to resolve things and what the scope of that would be. The clearer point here is that there's just nothing that's in the record that shows that the farmer would have any incentive to do anything and that's really all you need to know. All those other points are true and worth considering I think but the easiest point here is just that last one in my opinion at least. I've only got a couple minutes left so I want to quickly hit on the merits if that's alright with you. I think the crucial point here is plaintiff has not renewed their hard look objection and so if the agency reasonably determined that the design features of the farm made it likely that it would have only minimal and localized negative effects, you can find that determination on Joint Appendix page 669-70. If that's correct and plaintiff hasn't appealed the district court's decision on that point if that's the case then the cumulative impacts analysis is quite simple simply because cumulative impacts looks at incremental impact. If there's no incremental impact from the farm in any of the areas that they're concerned about, that puts an end to the inquiry. Now I grant of course that the agency didn't say that there would be zero impact in some kind of metaphysical certainty, but I point the court to Minisync which said that when the project itself is expected to have minimal impacts, no significant cumulative impacts from related actions need to be considered and I think the agency did look at a lot of other things including the TMDL Caroline County more generally and the Upper Chalk Tank, but the point here that's most crucial is that if you have only minimal impacts there is no there's nothing to add to those that makes it significant. And Kleppe v. Sierra Club held that the determination of the geographic scope and cumulative impact is up to the agency to decide. That's correct your honor and I would say that there's two parts to the geographic analysis. One is looking at the scope and looking for what kind of effects might be out there and the second is actually determining where the effects are going to fall. So when you plaintiff tries to conflate these two points I think, but when you think about it the consideration of all the stuff more broadly was just a part of the agency's determination that in fact this farm has only minimal and localized impacts and that's dispositive. I see my time has run out. If there are any other questions I'd be happy to answer them otherwise I guess I'm already sitting down but I'll sit down. Judge Randolph? No. Thank you Mr. Buschbacher. Thank you your honor. Ms. Heinsen we'll give you two minutes for rebuttal. Thank you your honor. On the cumulative impacts point finding that a facility will not have significant impacts on its own does not mean that it cannot have cumulatively significant impacts and the district court got this point wrong. In the Minisink case this circuit found that a facility would not have individually significant impacts and it also found that it would not have cumulatively significant impacts but that case was in large part determined because the impacts of concern had to do with construction and the timing of the different projects were different so the impacts did not aggregate. The district court erred as a matter of law in finding that a facility without significant impacts on its own could not have cumulatively significant impacts and permits that purport to minimize impacts don't change that analysis. This is the entire point of the cumulative impacts review. On the question of whether staying in order to vacate the guarantee would cause a standing problem, I believe it would not because standing is evaluated assuming that the plaintiff will get the relief requested. The court did the same thing in Friends of the Earth, the EPA where it vacated a total maximum daily load and then stayed that so that there would be protections in place for the waterway. Would you define for me what you are claiming is the harm to the members of your organization? The injuries here and the failure to properly prepare an environmental assessment? Yes, Your Honor. So this is a procedural injury from the agency but the injury in fact experienced by our members. Mary Lou Miller lives next door to this facility and in her declaration she has suffered injuries related to odor and flies and noise and bright lights. She's impacted on a day-to-day basis. Her quality of life has suffered. Our other member declared But I thought in environmental impact statements and environmental assessments that the ultimate decision of the agency is not up to an environmental impact statement and it's not up to an environmental assessment. All they're designed to do is provide information to the agency on which to make its decision. So the injury that you're defining doesn't seem to me to be connected to the purpose of an environmental impact statement. The purpose is to give information to the agency and you as your members injury it seems to me would be that the agency went ahead and made a decision without having sufficient information. Well, Your Honor, we meet the relaxed redressability standard under NEPA for the agency's action here but we have to satisfy the normal redressability standard to show that if the agency were to impose additional guarantee conditions following NEPA analysis, we don't have to show that they would. But if they do, we do have to show that it's likely that the third parties here would agree to those conditions and we believe we've done so in this case. And I see that I'm out of time. Okay. Thank you. Thank you. Case is submitted.
judges: Garland, Rao, Randolph